Good morning, Judge Kleinfeld, Board Law, Judge Fletcher. My name is David Porter. I represent Guy Terrell Lorick. Many things can be said about Mr. Lorick. One thing that cannot be said about him is that he slept on his rights. He vigorously, some would say relentlessly, pursued state post-conviction relief, not in the most orthodox fashion, I will admit, but always in ways, and this is most important for this case, always in ways authorized by the law of California. Why didn't he know the gist of his claim, his claim that his lawyer did a bad job on the cross because he mixed up the witness with somebody else that he'd represented? Why didn't he know that at the time of his trial or at the very latest at the time of his sentencing? Oh, he knew that, Your Honor. Everyone in the courtroom knew that Mr. Stathis did a completely lousy job of cross-examining the victim in this case. Even the victim knew that he did a lousy job because she finally said after three pages of transcript, you've got the wrong person here, that ain't me. So everyone in the courtroom knew, and he knew as well, that he was ineffective. The claim that he's raising here --- I know that follows. Lawyers occasionally do get confused about who's who and whether it's ineffective is another step, but it seems like if it was ineffective, he knew the gist of it then. Yes, Your Honor, but the crucial matter is when he knew about the factual predicate for his claim. And his claim that he's raising here is not ineffective assistance of counsel. It is a conflict of interest. And he only knew about the factual predicate, he only had a good faith basis for knowing the factual predicate of that claim on July 21st, 1999, when he discovered, lo and behold, what he thought was the truth was, in fact, the truth. There are seven cases in the Court of Sandy and the Superior Court of San Diego. Wait. He discovered what he thought was the truth was, in fact, the truth? He yes. But once he thought it was the truth, it seems like that's enough. No, Your Honor, it's not. He did not have a good faith basis for asserting that until he found out that those records were in the court. He could not have asserted that in good faith before that, before that point. And so that is when the statute of limitations began to run under. But wasn't it clear that there wasn't a conflict in 1993? It appeared clear, Your Honor, but what appears clear is not always clear. And that is why in 1999, on July 21st, when he found that, in fact, there were these other files, that is when he had a good faith belief that there was, in fact, a conflict. Well, if he had that belief on July 21st, why didn't he mention it in the Federal habeas petition he filed on July 25th? Your Honor, he is a pro se petitioner, and he is not practiced in the law. He did not understand that that was crucial to his conflict of interest claim. But he did raise the conflict of interest claim. But you just said that he found out that what he thought was true was actually true July 21. Wouldn't anybody think that was significant? Well, I think... Enough to put in the petition where you're trying to get relief based on that? When it was called to his attention when the Respondent filed a motion to dismiss, Mr. Lorick, in his request for discovery, did elaborate on those facts and did file a declaration that these files had been found. You, in your recent letter, mentioned that the government concedes that the statute of limitation was told until July 25. Where does the government concede that? I thought they were arguing that the period began April 24, 1996. I did not say that they believed it was told until that time. They believe they agree, the Respondent agrees that there was tolling between the time that the State's petition was filed in the Superior Court and when the State's Supreme Court decision denying the habeas petition became final. That period, we both agree, has been told. But Your Honor is correct. They do not agree that the statute has been told from the date of the enactment until that Superior Court habeas petition was filed. Can you help explain to me the difference between the claim he is now making, that is to say, actual conflict of interest, and the claim that was litigated in the Marsden hearing and what different arguments were made or could have been made or should have been made in those two things? Yes, Your Honor. During the Marsden hearing, what Mr. Lorick knew was that there was a tremendous mix-up, that his lawyer believed that the Office of the Public Defender had represented the victim in prior case or cases, and he learned that the lawyer was mistaken. And he learned when that the lawyer was mistaken? Well, I believe when the judge – the cross-examination happened on Friday. The following Monday, the judge told the jury that these people are different, in effect. And so I believe at that date, he learned that there was a mistake. He still believed, though, however, that the Public Defender's Office had represented Charlotte Michelle Johnson in other cases. And for the next three or four years, he asked the Superior Court, every court that would listen to him, please turn over the records with Charlotte Michelle Johnson in them from the Superior Court, and that was never done. And if he had had the evidence that the Office really had represented this victim before, what different arguments would have been advanced at the Marsden hearing? That's very difficult to say, hypothetically, Your Honor, but when an office represents a person, especially in a criminal case, they come into a tremendous amount of knowledge about that person. In preparation for the probation report, they have to find out everything there is to know about that person, their social history, criminal history, sexual history, educational, social, all sorts of things. And so that information that came into their sort of office's knowledge had to be held confidential. And if he knew at that point that that person's whole history was off, you know, out of bounds for him, essentially, because he owed both a duty of confidentiality and a duty of loyalty to the prior client. And that could have been proven at the Marsden hearing. As you say, he, the lawyer then representing Mr. Lorik, knew. This is puzzling to me, because maybe it's the problem of the conceptual problem of double negatives and falsity and truth and so on. But the problem that took place at the actual trial was not that the lawyer representing Mr. Lorik knew this person from prior representation. In fact, the problem was quite the opposite. That is to say, he thought he knew from whatever source, I don't know, but he had the wrong person. How does that cut for you? Well, Your Honor, I don't think it cuts either way. I think the problem in this case right now is whether he had a good faith. There are two elements to a conflict claim. One is an actual conflict, and one is that it adversely affected performance. He knew it adversely affected performance. The issue here is Now, why did it adversely affect performance? That is to say, it turns out that the guy was totally noncompass. He confused her. It's not as though he had information about her that he was not using. He was using all kinds of information, but about the wrong person. The guy was just out of his mind. I shouldn't say that about the lawyer. The lawyer was making a mistake as to the identity of the person. Yes. But with conflict of interest cases, that's the reason why there's a different standard under Sullivan and Holloway. What the lawyer It's often what the lawyer failed to do that he could have done. Counsel, I have a lot of trouble with this under Kyler, the leading conflict case. You need some sort of prejudice, and it looks here as though you have a highly abstract, hyper-technical conflict that would have justified getting the lawyer off the case, but it doesn't amount to any more after the latest factual revelations than it did before. I mean, what you've got is this crazy business of trading sex for $11 and some the woman, and she breaks her pelvis in these terrible injuries, and whether the public defender's office had represented the woman in some prior case seems highly unlikely to have mattered. In fact, it didn't matter. In fact, instead of taking advantage of the prior representation or failing to take advantage of the prior representation, the lawyer just was confused about who was who. What would have mattered is if the lawyer had stayed away from something that would have helped your client at his trial because he didn't want to make himself vulnerable to a grievance on behalf of the woman. But he didn't do that. I can't see where under Kyler there's anything to go on after the latest factual revelations that weren't there right from the get-go. Your Honor is mistaken. Kyler is not the case. Kyler has never been cited in this case. I know it's never been cited. The case is Sullivan and Holloway. Those cases provide that you do not need to prove prejudice on an actual conflict of interest case. And that may be – I mean, I've been leading us down this path because the question is interesting because I want to get a full sense of the case. That may not be in front of us, though, right now, because that's the merits as to whether or not he has a good claim. What we're after is whether or not he's entitled to tolling or whether he's entitled to say, well, this is newly discovered evidence that forms the basis for my claim and can I bring it. That's exactly correct. And that's why we are entitled to a remand for the discovery, because if we can discover that, then actually it's a remand. Then maybe you'll learn something. Then it supports the allegations of actual conflict. And then maybe you might learn something that would be prejudice that you can't now know. That's correct. You can suspect, but you don't know. That's correct. But, again, we do not need to show prejudice. That's the whole point. Okay, but that's on the merits. Let me ask you this, and I realize we're running over, so I'll try to make this as quick as I can. We have him filing his federal habeas petition very shortly after he apparently learns or thinks he knows or has some basis for belief that it really was the same person. How long after the filing of his habeas petition did he seek discovery of the documents that would prove what he thought? Not very long, right? July to October? Yes. So he either knew it just before he filed or he knew it shortly after he filed, and maybe he knew it, maybe he didn't. Is there any requirement in law that, as a matter of pleading, he has to put into the petition the specific fact, even for a counsel litigant? I believe not, Your Honor. The reason being that statute of limitations is an affirmative defense. It's only raised once a year. Would it be an appropriate subject of discovery if it's disputed when he might have learned it, that maybe it's implausible? Maybe it's not. I don't know that he knew it only four days before, but is that an appropriate subject of discovery? And if we find out on discovery that he knew it two years earlier, well, boom, he's out of court. But if we find out he truly did learn it four days before, then he's okay? Yes. So it's not for us to decide whether he learned it four days before or did not. The proper place for that is in the district court, Your Honor. Okay. And if I might just finish up the, I filed a supplemental authority letter that has a I apologize for that. But the point being that under the King case, Mr. Loehrig had two rounds, the first round being the petition to recall the remediator and the State habeas corpus, which all involved the same issues, and therefore was that related to the direct appeal or not? Was that related to the habeas or the direct appeal? The petition to call the remediator is a post-conviction remedy. Is it a collateral remedy or is it related to the direct appeal? It's a collateral remedy. Okay. It is filed after the finality of the conviction and asks the court to recall the remediator to allow it to resume jurisdiction and to, in California, it has been allowed to raise ineffective assistance of counsel claims. Thank you, counsel. Thank you. Good morning. Deputy Attorney General Matthew Mulford on behalf of the warden of Mule Creek State Prison, who is now Michael Knowles. It's K-N-O-W-L-E-S, if you're curious. So should we be substituting that name? I would think so, yes, under the, I think it's Rule 43 in the Rules of Appellate Procedure for Warden Lewis, yes. Regarding the first issue, I think the panel's questions indicate that the court has specifically found that this is the same claim that Lorek is now raising in his federal habeas petition that he previously presented in the state courts. In fact, Lorek's petition itself, it excerpts a record 74, specifically indicates that whatever he learned in these, by the existence of these case files was, let me quote here, immaterial whether or not the San Diego Public Defender's Office had ever represented the victim in this matter, Charlotte Johnson. So even if he has no due to actually plead it, Lorek actually, in fact, disclaimed reliance on this fact in his pleadings. And because of that, I think it's pretty safe to say that he cannot. I'm sorry, I'm not following you. What's your basis for saying he disclaimed reliance in his pleadings? Lorek filed the petition with five separate grounds in federal court. I've got my excerpt, so read along with me. Page 74 is one of the three, actually one of several pages regarding ground 5. Okay. And what document am I looking at here? This is document number 15. This is the petition that Lorek filed in federal court. So this is his habeas petition. This is his habeas petition. Okay. I'm with you. Okay. Ground 5, which is, broadly speaking, the ineffective assistance of counsel claim, but also arguably has a conflict of interest claim as well. At page 74. Yeah. Third line down. Yeah. It is immaterial whether or not the San Diego Public Defender's Office had ever represented the victim in this matter, Charlie Johnson. So even if we construe Lorek's argument in the best possible terms for him today, that is, the files that he discovered in 1999 arguably show that the San Diego Public Defender's Office had previously represented Charlie Johnson, Lorek's claim, so it doesn't matter, which should be the end of any discussion regarding 2244D1D on a newly discovered factual basis. Now, the magistrate relied on this in the report and recommendation. And as far as we're concerned, that doesn't matter. We agree with Judge Kleinfeld's questions regarding the show of prejudice, and I think that he cannot show prejudice in light of this fact and what happened, actually, at trial under Klyler-Hendikens v. Taylor. Those cases were both cited in our brief. Yeah, but that goes to the merits of the claim. Under Hassan v. Galazes, under this Court's opinion, Hassan v. Galazes, there's a little bit of going to the merits. I'm not quite sure how to explain that or discuss that. But in Hassan, the petitioner made a plausible showing, I guess this is how I would describe it, a plausible showing of possible prejudice, and this Court remanded for further evidentiary hearing. Here, Lorek cannot even make a plausible showing of possible prejudice, so there's no need for more information. I think turning to the second issue, the statutory filing issue, is the more interesting one. This is factually interesting because, again, Lorek certainly pursued his state remedies with vigor. He had 23 separate filings, when I think three would have been sufficient. And it's legally interesting because we're dealing with the interplay in 2244D2  and how that was discussed in the United States Supreme Court's Kerry v. Sasson opinion. Lorek didn't sleep on his state rights, but he did sleep on his federal rights, and that's the distinction that matters. Now, there's lots of filings, there's lots of properly filed petitions, but I think the issue boils down to two separate gaps. That is, the period of time after one state court denied a petition and the time before he filed the next petition. The two critical gaps that Lorek needs tolling for both of, the entire periods are, the gap following the 1996 petition to recall the remitter, which was denied by the California Court of Appeal, and then 81 days later, his filing in the San Diego County Superior Court. So that's 81 days where he went from the Court of Appeal, one appellate level, to a lower appellate level and pursued habeas corpus relief. That is outside of California's standard, ordinary, habeas corpus collateral relief jurisprudence. The California Supreme Court has said that clearly in 1993 in Henry Clark, the case cited both in our brief and by Justice Breyer, United States Supreme Court opinion in Saffold. The second gap that Lorek also needs time, tolled for the entire time, is the period of time after the California Supreme Court denied his second petition for writ of mandate in the summer of, I think, 1998, for the 200 and some odd days until he filed a third petition for writ of mandate in the California Court of Appeal. Again, Lorek went from one appellate level to California Supreme Court and made another filing in a lower appellate court. I'm still puzzled by how the petitions for remitted or petition for mandamus fit into the original writ system in California. I mean, are they part of it, or are they different outside of it? It's a very fair question, and I'll do my best to answer it, but I'm not sure if they fit neatly within the Federal framework. The petition to recall the remitted or in California is typically used when a party wants to seek certiorari in the United States Supreme Court after they have lost their claim in the California Supreme Court. So typically what happens after that, after the Supreme Court's denial of the claim, the case will go back to the Court of Appeal, and they will issue a remitted or almost automatically, and that usually happens within a week. And then if anything needs to happen at the trial court level, the remitted or is the thing that keys further trial action. So the remitted or does not fit well within the Federal jurisprudence regarding finality, because finality is triggered on the Supreme Court's petition and decision and not the remitted or. So it's not, it doesn't fit neatly in either collateral or direct appeal. I guess it's unique. Do we consider it in our properly pending analysis under the cases that have recently come to light? I think I want to clarify the question. You may consider it as a properly filed State petition for collateral relief. It's clearly after postconviction. It is clearly pending in the Court of Appeal for some days. So it is properly filed within the meaning of Artuse v. Bennett. There's a separate question as to whether or not the time after that petition was denied and before the next petition was filed, that gap is pending under Cary v. Saffold. Our position is that it is not. Because? Because California's collateral, the ordinary collateral remedy is habeas corpus, and it is not petitioned to recall the remitted or. And we know that from N. Ray Clark. Okay. The second gap, again, now we're talking about the petition for rid of mandates. Mandate is also not part of California's ordinary habeas corpus collateral jurisprudence. Again, N. Ray Clark. Forty years ago. Now, California is very liberal and treats petitioners very kindly. And so they are not always bound by the caption on the page. So if you file a petition for a mandate and you have not filed any other California courts are inclined to treat that petition as a habeas corpus petition. So you really have to look at what they were petitioning about. Were they petitioning, for example, about some order in the superior court related to their habeas relief, or were they making a new filing with a new claim? That's correct. Yes. And you also need to see what other cases they have filed before that as well. Okay. And that's Mr. Lorek's problem. Why can't the state of California just make this easy on us? I would love for them to do that. I don't think there's anyone in this courthouse that would be happier than someone trying to defend the court's practices. I'm just wondering. I've been wondering why you're the state attorney general. You have to do all these cases. Why you wouldn't want to try to change California's system and make it a more sterile system more clearly? Yes. We've tried. And there's political obstacles to that as well. I don't want to say this. We do have rules. They're not statutorily specified. They're announced by the California Supreme Court. Henry Clark gives the rule. Successive petitions are barred. And we know that federal courts need to honor those rules because that's what Justice Breyer said in Perry v. Saffold. That's right. However odd they may be. However crazy they are. And so, you know, we think that Justice Kennedy had a better argument there. But Justice Breyer also applied that Clark rule in giving gap tolling for only one round of habeas petitions and nothing more. I see my time has expired. But I would like to make one more point regarding the Biggs case, if I may. The Biggs case speaks in terms of rounds of post-conviction collateral review in California. That's a term that I think we should avoid whenever possible. California only permits two rounds. One is the direct appeal, the trial, the direct appeal, the petition for review. The second round is one habeas corpus series, however he wants to do it, the Superior Court, Court of Appeal, California Supreme Court. Beyond that, we're running into successive petition bars in Enright Clark. If we speak of multiple rounds that are all entitled to more tolling than that, this Court, the Federal courts, would not be giving due respect to the California Supreme Court's announcements of its procedural rules, as they said to Clark, and in Robbins and later cases. Thank you. Thank you very much. Laurie B. Lewis is submitted.
judges: Kleinfeld, Wardlaw, W Fletcher